UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND - (Greenbelt)

UNITED STATES OF AMERICA          :

v.                                :          Criminal No. PX 18-110

AYALEW HAILE                      :

         Defendant          :

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

The Defendant, Ayalew Haile, by and through undersigned counsel, hereby submits this Memoradum in Aid of Sentencing scheduled before the Honorable Paula Xinis on January 4, 2019 at 2:00 p.m. For the reasons stated herein, a downward departure to 18 months from the sentencing guidelines range is sufficien, and not greater than necessary pursuant to 18 U.S.C. § 3553(a).

## I.    INTRODUCTION

On September 20, 2018, the Defendant appeared before this Honorable Court and entered a guilty plea to Wire Fraud in violation of 18 USC § 1343 pursuant to a written plea agreement. The Court Ordered a Presentence Report and it has been submitted to the Court, Mr. Haile, and the Government.

In this Memorandum, Mr. Haile will argue that a sentence of probation followed by a period of supervised release is adequate and appropriate in this case to serve the sentencing purposes and factors set forth in 18 USC § 3553.

All parties and the U.S. Probation Office agree that the final offense level is calculated

1

under the guidelines at 21.  The base offense level for this offense is 7, to which 12 points are added because the loss amount of $414,197.99 exceeds $250,000.00, but is less than $550,000.00.  2 points are added because of the use of sophisticated means, and another 2 are added for Mr. Haile's position of trust.  From this level of 23, 2 points are subtracted based on Mr. Haile's acceptance of responsibility.  Thus making the final guidelines offense level 21 with a suggested sentence of 37-46 months.

**1.The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant Pursuant to 18 U.S.C. §3553(a)(1)**

Mr. Haile accepts full and complete responsibility for the wrongfulness of his actions in this matter.  He is ashamed of his stealing, his violation of the trust he was given, and the difficult and unfair position he has put his family.

Mr. Haile is a proud, self-made man, who came to this country in 2002 to escape persecution for voicing opposition to his government in Ethiopia.  In Ethiopia, he was targeted for asking questions of the government.  As a graduate student with some education and a critical mind, he resisted attending mandatory government meetings.  He was physically threatened on multiple occasions for not attending these meetings, and for asking questions when he attend.  He fled Ethiopia to the United States as a young 26-year old man, seeking an education for himself and a better life for his family.

Mr. Haile was granted asylum in 2004.  He left his wife of two years, Menbere, in Ethiopia with a promise to bring her to the U.S. as soon as he could.  Mr. Haile wasted no time continuing his education.  In 2005 he received a bachelor's degree in accounting from Straayer

University. He followed that by earning a Masters in Financial Management and Information Systems at the University of Maryland University College, as well as his CPA in 2008.

During his time in school he continued to pursue his dream of becoming a U.S. citizen. Mr. Haile received his green card in 2006/07 and finally became a naturalized citizen on May 9, 2009. Up until the time of this offense, Mr. Haile has maintained continuous and rising employment. He worked hard and excelled in accounting, doing great and reliable work for the various employers and organizations which employed him.

Several years after arriving in this country Mr. Haile was joined by his wife, Menbere. Although they both felt very fortunate to the in the United States, times were often difficult for Menbere and their relationship. She spoke no English and did not work. The children they had together kept them together, but there were times of emptiness between them. Still, Mr. Haile continued to work hard and provide for his new family.

In 2012, Mr. Haile learned that his wife was having an affair. Times were challenging for them both before, but the affair strained the relationship even more. At that time, they did not speak often. When they did, it was mostly yelling. Mr. Haile was ashamed of the state of his marriage, but did not have anyone to turn to. He was ashamed to tell friends what had happened, but the thought of being apart from her and the children was unimaginable. So he put his head down and pressed on with his work and with his marriage in an attempt to keep his family together.

Prior to 2012, Mr. Haile had never been to a casino and never gambled. He saw ads on television for the new Maryland Live casino and he decided to give it a try. It was a bright place full of fun and excitement that gave him an escape. Eventually, he began spending more and

more time at casinos, sometimes every night. Staff from the casinos noted that they would see Mr. Haile gambling on multiple nights in a row, sometimes for up to 10 hours straight. The more he played, the more he lost. Before he made his first fraudulent withdrawal from the Rochambeau French International School, Mr. Haile was gambling at alarming levels and had lost the entirety of the money he had worked so hard to save. The attached activity statements from Maryland Live show the rapid progression of Mr. Haile's debilitating gambling addiction.

The yearly totals are summarized from these statements below:

| Year | Dollars In | Dollars Out | Win/Loss |
| --- | --- | --- | --- |
| 2012 | $4,482.00 | $4,220.50 | -$261.50 |
| 2013 | $98,271.40 | $87,077.49 | -$11,193.91 |
| 2014 | $286,176.10 | $215,092.29 | -$71,083.81 |
| 2015 | $310,460.44 | $250,990.11 | -$59,470.33 |
| 2016 | $844,884.71 | $678,988.51 | -$165,896.20 |
| 2017 | $551,799.77 | $443,173.38 | -$108,626.39 |

When Mr. Haile made the decision to take money from the school for the purposes of winning back his savings and avoiding humiliation. He always maintained the belief that the money was a loan that would be paid back. Typical for a compulsive gambler, he operated under the delusion that his fortunes would turn around and he would deposit the winnings back into the school's account. As he lost more, he "borrowed" more from the school. In a hopeless situation, he had found quick sand in the hope that the casino offered.

Despite the large sums of money he took, Mr. Haile has seen zero personal gain from any of it. He did not spend a dime of that money on vacations, or luxury items, or clothes, cars or even his mortgage. None of the money from the school went to him – it all was lost at the casino. This is because in his delusional state of mind, at the time he was taking the money he was playing to pay back the school, not for himself.

In determining a sentence, the defendant's state of mind and motivation for committing the crime must be considered. The taking in this case was not done for personal greed or avarice. It was done and continued with the false and delusional hope Mr. Haile maintained that he could somehow win his way out of the enormous personal problem he created for himself. He knows this was foolish and wrong. He knew it was foolish and wrong at the time he was taking the money. However, he wrongfully saw it as the only way to correct his problem.

Mr. Haile concedes that on the day that he was supposed to meet with prosecutors and his counsel to discuss a resolution and acceptance of his responsibility in this case that he chose to go to Niagara Falls, Canada. He knows that this was the wrong decision and that he is paying for it now. However, his leaving the country further illustrates the hope that he continued to harbor to pay back the money and solve this problem. Although Mr. Haile applied for multiple jobs in Niagara Falls, it is no coincidence that Niagara Falls is one of the locations in Canada known for having casinos. Mr. Haile continued to harbor hope of a big-win solution at the casino to solve this problem and be able to return home. This is illustrative of the altered state of reality he was trying to manage as a compulsive gambler who chose to return to gambling to solve the problem that gambling had created.

In very brief response to the Government's argument with regards to the school's financial condition, the defense is certainly not arguing the school was not negatively affected by Mr. Haile's crime, and by no means is the loss of over $400,000 a small amount. However, to provide a complete picture to scale, the school's most recent 2016 Form 990 Return of Organization shows the school's Total Assets increased from $36,958,864.00 on July 1, 2016 to $40,986,408.00 on June 30, 2017. Net assets increased from $20,433,553.00 to $21,017,827.00 over the same time period. (See Form 990 attached). It is of note that the ending period of June 2017 and the filing date in May 2018 were well after the money Mr. Haile fraudulently took was discovered.

Although the new label of felon will make it extremely difficult to recover professionally in the financial field, with help and assistance, Mr. Haile is a strong and diligent person with a strong educational background who will ultimately recover. Now that the news of this crime is public amongst family and members of his community, friends have reached out to him for potential employment at immigration firms, accounting firms, and companies seeking Amharic translation services. In the interim after being released and seeking employment, he also holds a license to drive a taxi which he can earn approximately $40,000/year or more depending on the amount of time he works. Paying the restitution in this matter is a priority for him, and the sooner he is released the sooner he cannot begin to pay the restitution. 18 U.S.C. § 3553(a)(7).

Mr. Haile has also remained busy in jail. He has begun to write several books he hopes to publish, one of which is his true story about the pitfalls of gambling addiction. He is hopeful it can help people realize the dangers of gambling and avoid his situation.

**2. Pursuant to the factors set forth in paragraph (2) of 18 U.S.C. § 3553, an 18-month sentence is sufficient but not greater than necessary.**

As someone who has no prior criminal record and no history of recidivism, an 18-month sentence is more than sufficient to get Mr. Haile's attention. He has lost his career and will go forward with the label of felon and re-establishing himself professionally. He has already spent more than 7-months at the Chesapeake Detention Facility, which is an elevated punishment in and of itself.

Mr. Haile needs treatment through Gambler's Anonymous and other addiction recovery services through supervised probation. Additional jail is not the answer. If Mr. Haile is released and commits other offenses after being incarcerated for 18-months, he will deserve any amount of revocation this court gives. Given his personal characteristics, lack of any prior record, and a distinct plan for re-entry to support himself and his family, deterrence from future criminal activity has been achieved and recidivism is unlikely.

**3. Family Ties and Responsibilities Warrant a Downward Departure U.S.S.G. § 5H1.6.**

Prior to his incarceration, Mr. Haile was the sole financial provider for his wife and three minor child. His eldest son Kenean is 11, Nathan is 10, and Eliana is 5. His wife Menbere does not have regular employment and only babysits occasionally. This is not sufficient to support the family. While Menbere receives some support from the family, she has mainly relied upon government assistance for food stamps and healthcare while Mr. Haile has been incarcerated.

Most significantly, his middle son Nathan suffers from an enlarged patent arterial duct and has undergone two surgeries and requires constant care. His condition requires him to have a Individualized Education Program. Because Mr. Haile's wife has very limited proficiency in

7

English and difficulties communicating with school personnel, Nathan is not getting the daily support he can only get from his father.

Pursuant to the factors in paragraph B of the Application Note, this continued harm to Nathan's education will be exacerbated by a prolonged incarceration within the guidelines. The ability to communicate with teachers to understand his progress at school and comply with their requirements and recommendation at home is something only Mr. Haile is in position to do. This is a unique situation specific to Mr. Haile, and only his care and financial ability will alleviate this substantial, direct and specific loss of essential caretaking.

4. **Mr. Haile has Endured Unduly Harsh Conditions of Pretrial Confinement Which Warrant a Downward Variance of the Sentence or, in the Alternative, a Downward Departure From the Guidelines.**

Consideration of Mr. Davis's harsh conditions of pre-trial confinement may also be considered by the Court in selecting a sentence that is "sufficient, but not greater than necessary" to satisfy the sentencing goals of §3553. See *United States v. Stevens,* 223 F.3d 239 (3d Cir. 2000) affirming district court's authority to grant a downward departure based on substandard conditions of pretrial confinement); *United States v. Pressely,* 345 F.3d, 1205 (11th Cir. 2003) (holding that district court erroneously believed it lacked authority to depart downward because of pretrial conditions); *United States v. Carty*, 264 F.3d 191 (2nd Cir. 2001) (holding pre-sentence confinement conditions may, in appropriate cases, be a permissible basis for downward departures.)

Although Defendant does not seek a below guideline sentence in this case, there are three potential legal bases for the Court's authority to impose a below-guideline, variant sentence for unduly harsh conditions of pretrial confinement that have been recognized by various Courts.

First, pursuant to the United States Sentencing Guidelines, a sentencing court may depart if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 5K2.0 (quoting 18 U.S.C. 3553 (b)).  The Second Circuit has recognized, "there is no indication that the Commission [even] contemplated that federal pre-sentence detainees would be kept in any detention facilities other than federal facilities." *United States v. Carty*, 264 F.3d 191 (2nd Cir. 2001), *see also United States v. Bakeas,* 987 F. Supp. 44, 50 (D. Mass. 1997). Second, §3553(a)(2)(A) directs a court to impose a sentence that will "promote respect for the law," as well as "provide a just punishment for the offense." 18 U.S.C. §3553(a)(2)(A).  The District Court in *United States v. Sutton*, 2007 WL 3170128 (D.N.J. October 25, 2007) relied upon this provision in holding that the overly punitive nature of the defendant's pretrial incarceration warranted a variance.  Its decision followed a full evidentiary hearing at which numerous witnesses testified about the "unacceptable" conditions of confinement. Third, the Court's authority to impose a below-guideline sentence to account for overly punitive conditions of pretrial confinement finds support in §3553 (a)(2)(D) which calls for a sentence that "provide[s] the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner." 18 U.S.C. §3553(a)(2)(D). The *Sutton* Court, relying on this provision as further support for its authority to grant a variance, stated: If the lack of federal detention facility means our prisoners endure conditions such as daily life in [a substandard state facility] … then the Court must factor into the full sentence the overly punitive nature of such an experience… [T]he logical way of acknowledging he was punished "more than necessary" under conditions that violate one of the

9

goals of a reasonable sentence, is to reduce the extent of the overall sentence he must serve. *United States v. Sutton* 2007 WL 3170128, at 15 (emphasis supplied).

This Court is certainly aware of the substandard environmental conditions of the Chesapeake Detention Facility (CDF) where Mr. Haile has been held since his arrest in this case. Mr. Haile has asked counsel to alert the Court of these conditions and argue for a variant sentence or, in the alternative, a downward departure for the guidelines on this basis. To summarize these substandard conditions, Mr. Haile resides in a tiny cell designed for one person but shares his cell with a cellmate. The plumbing leaks causing puddles on his floor and there is no hot water. The HVAC system inoperable and unable to provide cool air throughout most of the summer, making the hottest days nearly unbearable. There is constant noise making sleeping very difficult and causing him to endure a perpetual headache.

For these reasons, there are sufficient grounds for this court to grant a downward variance of the sentence or, in the alternative, a downward departure from the sentencing guidelines.

### IV. CONCLUSION

After consideration of the sentencing guidelines range as well as the six factors contained in 18 U.S.C. §3553(a), a sentence of 18-months followed by supervised release is appropriate in this case.

Respectfully submitted,

_____/s/_____
Jonathan Oates, Esquire
Krum, Gergely, & Oates, LLC

200A Monroe Street, Suite 305  
Rockville, Maryland 20850  
Telephone: 301-840-0080  
Facsimile: 240-341-1423

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 28th day of December, 2018, a copy of the foregoing Memorandum was served, via PACER, upon:

Elizabeth S. Boison, Esquire  
Special Assistant United States Attorney

Erin. B. Pulice  
Assistant United States Attorney  
United State's Attorney's Office  
For the District of Maryland

                                                      /s/_____  
                                            Jonathan Oates, Esquire